# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:15CR035-2 |
| Plaintiff, | : | |
| | : | JUDGE JAMES S. GWIN |
| -vs- | : | |
| | : | |
| NICHOLAS DANIEL, | : | **DEFENDANT NICHOLAS DANIEL'S** |
| | : | **MOTION IN LIMINE** |
| Defendant. | : | |

Defendant Nicholas Daniel, through counsel, respectfully requests that the Court issue an Order in Limine prohibiting the government from introducing any evidence and/or testimony related to cellular phone records and correlating exhibits produced by the government pursuant to Fed. R. Evid. 104, 401, 402, 403, 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), because the government intends to call a lay witness as its expert and because the evidence the government intends to produce is both inaccurate and misleading considering the actual science in the field. A Memorandum in Support is attached.

Respectfully submitted,

*/s/ Carlos Warner*
CARLOS WARNER (0068736)
Assistant Federal Public Defender
Akron Centre Plaza
50 S. Main St., Ste. 700
Akron, OH 44308
Phone: (330) 375-5739; Fax: (330) 375-5738
E-Mail: carlos_warner@fd.org

**MEMORANDUM IN SUPPORT**

I.     INTRODUCTION AND SUMMARY

Cellular tower and call data analysis can be at once powerful and confusing to a fact finder. Here the government has submitted exhibits that are factually and scientifically incorrect because either the government's agent does not understand how cellular networks operate and how correlating data may be properly used, or the data was otherwise manipulated by the government for a specific result. In either case, Agent Kunkle must be disqualified as an expert and the proposed evidence must be suppressed.

Defendant Nicholas Daniel is charged with ten separate counts of Hobbs Act Robbery, one count of conspiracy to commit those robberies with Mr. Daniel's co-defendant, Quentin Blade, and two counts of brandishing a firearm pursuant to 18 U.S.C. § 924(c)(1)(A). Mr. Daniel has previously admitted that he was involved in at least four of these robberies. He has sought to enter a plea to the conduct he committed.

Inexplicably, the government has sought to plea bargain with Mr. Blade, someone who admittedly planned the aforementioned robberies, recruited Mr. Daniel for several of the robberies and brandished the purported weapon (evidence thus far provided indicates a pellet gun was likely used). Mr. Blade also is a likely Career Offender and natural CHC VI. According to pretrial conversations with the government, this decision was made because "Mr. Blade's story fits our evidence better."

One of the many problems with this observation is that the government's interpretation of the evidence *sub judice* is scientifically wrong. Mr. Daniel lives in close proximity to many of the cell towers utilized by the government, yet this factor is not included or considered in the

1

government's evaluation. As described below, the exhibits produced by the government are not justified scientifically and are otherwise misleading and in some cases wholly incorrect. Amongst other things, the F.B.I. has not employed surveying equipment, has misidentified the orientation of antennas on towers, and perhaps most shockingly has not used a current map including locations of all cell phone towers.

Without delving into possible motives for these incorrect exhibits, the source of these exhibits appears to be F.B.I. Agent Jacob C. Kunkle. It appears Agent Kunkle has zero relevant scientific training in the area save several two-week courses offered by the F.B.I. These courses are patently flawed, as even the introductory exhibits provided by Agent Kunkle (and assuming the F.B.I) are incorrect. The Defendant's actual expert clarified what can be can be scientifically discerned from the evidence in this case. The defense expert determined the F.B.I.'s analysis resulted in "wholly inaccurate conclusions."

### A. Agent Kunkle Does not qualify as an "Expert" under Fed. R. Evid 104 and 702.

Federal Evidence Rules 104 and 702 govern whether a witness is classified as an expert. Agent Kunkle's qualifications must first be determined, prior to determining whether the methodology employed by the expert is scientifically accurate. In some cases a witness may qualify as an expert although the science employed by the expert is flawed. In this matter there is some overlap as Agent Kunkle's obvious errors in his interpretation not only undercut his methodology, but also his qualifications as an expert. In short, Agent Kunkle is not an expert and his methodology is fatally flawed. Rule 104(a) provides:

> (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions

>of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Fed.R.Evid. 104(a). When "[f]aced with a proffer of expert scientific testimony under Rule 702, the trial judge, pursuant to Rule 104(a), must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  These "Daubert" factors include: whether the theory or technique in question can be tested; whether it has been subjected to peer review and publication; the known or potential error rate; the existence and maintenance of standards controlling its operation; and whether it has attracted widespread acceptance within a relevant scientific community. Id.  However, as a preliminary issue, this Court must first determine if Agent Kunkle qualifies as an expert under Fed R.Evid 104.

The proposed cell phone evidence provided by the government was provided to defense expert Ben Levitan.  With over 20 years of experience in the field, Mr. Levitan has worked for Sprint/Nextel, Verizon and Alcatel. He has twelve patents in the field, participated in the development of the US Wireless 911 system, authored five books on the subject, and has acted as a court-appointed cell phone expert in numerous criminal matters.  Mr. Levitan actually constructed and designed cellular networks for various carriers.  Mr. Levitan was one of the developers of the CALEA wiretap system and holds a patent in this area.  Levitan worked for GTE, the largest cell phone billing company in the world and was involved in the development of billing systems. His expertise in the area is beyond reproach. [Exh. A, Ben Levitan CV].

Mr. Levitan reviewed the call detail records and the maps which Agent Kunkle created. Based upon his review of the call detail records and maps prepared by Agent Kunkle, it is Mr. Levitan's opinion that the methodology employed by Agent Kunkle is not scientific and is unreliable.

Simply put, Agent Kunkle does not comprehend how cellular networks and the data associated with those networks function.

It appears Agent Kunkle received merely 4 to 6 weeks of F.B.I. training regarding cellular data and networks. [Exh. B, Kunkle CV]. Only a small part of this training involved data and networks according to his own testimony in prior cases. Much of this training was devoted to items like "How to Get Cell Records." So to say Agent Kunkle has vast training in the functunality of cellular records is incorrect.

It is Mr. Levitan's expert opinion that Agent Kunkle does not possess the requisite training, experience, or education to render a reliable scientific opinion [Exh. C, Review of Witness Qualification Report]. Agent Kunkle does not possess a degree of expertise in the field. Prior to 2013, Agent Kunkle had no experience whatsoever with cellular networks or cellular record analysis. In order to properly evaluate a scientific matter, the expert must have scientific education, skill, and experience to objectively evaluate data. Agent Kunkle has neither the background, education, or experience to perform a vigorous scientific evaluation of Radio Frequency Science and telecommunications engineering. According to his CV, Agent Kunkle does not possess:

1. expertise in electrical or radio engineering;
2. experience or employment for a cell phone company as an engineer or otherwise;
3. experience or employment in any sort of position involving technology, cellular or otherwise;
4. training in the various technologies employed by different providers.

Agent Kunkle graduated from a general forensic science program that has no relation whatsoever to analysis of cell phone data. Agent Kunkle has never been employed in the field of

4

telecommunications or in any engineering field. A corollary can be made here to the practice of law. To allow testimony with thus lack of credentials would be akin to permitting a law enforcement officer who took several two-week courses in criminal law to act as lead counsel in a federal criminal trial. Agent Kunkle lacks the special industry knowledge required to produce a reliable expert opinion based upon acceptable scientific standards.

True experts in this area, like Mr. Levitan, worked in the field, including in the design of cellular networks. This allows a true expert to independently analyze scientific data and telecommunications science. Experts also must have the requisite educational knowledge of the science of Radio Engineering and telecommunications. Experts must also possess special industry knowledge that enables them to authoritatively explain how the science is used in commercial and industrial applications. The expert has to know how a cell phone company uses this evolving technology to provide service. This is not a question of the weight of the evidence; rather, Agent Kunkle submitted incorrect exhibits due to his general ignorance of how cellular networks operate.

Mr. Levitan discusses why Agent Kunkle is not a qualified expert:

> This expert has a rudimentary understanding of cell phone technology and the cell phone industry itself. His education and training are not in engineering and telecommunications. His training involving cell phones was offered by others with little background and training in the field themselves. As such, any certification claims are moot. Further, this witness does not objectively evaluate evidence. His methods appear to be an attempt to use limited knowledge of cell phones to validate the prosecutions theory.
>
> The singular training he did receive from a vendor knowledgeable with the industry was in the survey of cell phone towers to determine its coverage areas. This was provided by a vendor who sells this equipment and is useful, however, these tools were not used in this matter. Rather, the F.B.I. opted to opine on what they thought the coverage of cell towers was.
>
> This witness is not an expert in cell phone analysis.

5

[Exh. C].

Mr. Levitan reviewed Agent Kunkle's testimony in *United States v. Demetrious Wright, et. al*, Case No. 1:12CR450 (N.D.Ohio 2012) (Dkt.#93). [Exh. D, Transcript portion].   Mr. Levitan found no less than 18 errors that illustrate Agent Kunkle is not qualified as an expert. These errors include, but are not limited to:

>1. frequency reuse and ranges of cell towers;
>
>2. the erroneous belief that Phones scan for networks (networks scan for phones that are discoverable to connect to towers, not vice versa);
>
>3. the erroneous belief that PEN or PIN register information is identical to Call Detail Records (PEN and PIN register information are not identical);
>
>4. the erroneous belief that antennas are not attached to cell towers (transceivers are attached to cell towers);
>
>5. the erroneous belief that modern towers have three faces (typical modern towers have six to nine faces, but as few as one or two towers could also be used);
>
>6.  how prepaid calling phones operate;
>
>7. that "Call Data Records" are purportedly maintained "by law" (they are not);
>
>8. the degree to which cell towers overlap (the testimony is inaccurate as it describes an inefficient engineering design);
>
>9. the erroneous claim that cell towers radiate a similar footprint (they don't, the footprint is determined by how the tower is engineered to function within the network); and
>
>10. the erroneous claim that his "presentations" were peer reviewed (CAST members are not accepted as "peers" in this particular scientific community).

Another example of Agent Kunkle's lack of knowledge can be found on pages 41 and 42 of the *Wright* transcript where Agent Kunkle is asked about when a call goes unanswered and is transferred to voicemail, whether the tower location is registered by the provider and can be identified for the unanswered call.  First, the Agent misidentifies the letter "F" as meaning a call was transferred to voicemail (see discussion *infra,* this symbol only identifies a multiple "leg" call). Then, Agent Kunkle erroneously testifies that tower information is not available "because the tower never contacted the phone." [Exh. D, *Wright* Tr. at 41-42]. This is patently false according to Mr. Levitan because when a phone rings, a cell phone tower is known and can be identified.  Thus, a plethora of incorrect information was provided by Agent Kunkle, under oath, to the *Wright c*ourt.

Even worse, on page 38 of the *Wright* transcript, Agent Kunkle inaccurately testified that the first tower recorded in call records is for outgoing calls while the last tower is used for incoming calls:

> The first serving cell site identifies the cell phone for outgoing calls. The first serving cell phase details the side of the tower for that outgoing call.  The last serving cell site is the cellular tower for incoming telephone calls, and the last serving cell phase would be the side of the tower that the phone was on for that incoming call, and then the calling party number who dialed the phone.

[Exh. D].  In reality, first and last sites relate to the cell towers used *during* a call. The Agent's testimony is beyond any rational understanding in this regard.  Whether or not a call is incoming or outgoing is typically recorded as a digit in another portion of the call record.

Agent Kunkle's CV does not detail any additional training since his flawed testimony in the *Wright* case.   What is perhaps most relevant to Agent Kunkle's lack of expertise are the numerous errors in the Agent's demonstrative exhibits and methodology employed here.  Agent Kunkle's analysis has clearly not improved since the *Wright* case. Even if the errors present in his materials

7

are corrected prior to trial, the report and exhibits of Agent Kunkle serve to disqualify him from this proceeding. In addition, the errors here, combined with his errors in *Wright,* should be considered in any future proceeding where the government intends to call Agent Kunkle as an expert witness.

### B.  Agent Kunkle's Errors in Introductory Exhibits

Mr. Levitan's report details numerous errors in the methodology employed by Agent Kunkle in his demonstrative exhibits the government intends to use for jury consideration. These exhibits "purported to be a scientific evaluation of the location and movements of three cell phones is unscientific and inaccurate," according to Mr. Levitan. The exhibits contain numerous errors regarding the basics of cell phone technology and Agent Kunkle lacks "the basic education, background, experience and specialized industry knowledge of the cell phone industry." [Exh. E, Levitan Report]. These errors range from mislabeling exhibits to misunderstanding terms to not understanding the orientation of certain towers, leading to complete inaccuracy.

Agent Kunkle uses a graphic in his presentation [Exh. F, Graphic 3] to explain how different numbers or letters Verizon's "call direction" detail records should be interpreted by the fact finder. Agent Kunkle incorrectly opines that if a letter "F" appears in the call direction box, the record indicates that a call was transferred to voicemail. This is incorrect. A letter "F" in this box indicates a multiple leg call, which could include switching of networks, adding or conferencing a call, removing a call or several other scenarios. This error demonstrates why the conclusions reached are incorrect and why Agent Kunkle is not qualified as an expert. As stated above, Agent Kunkle did not understand this distinction when he testified in *Wright*.

Agent Kunkle is also confused by basic terms like "terminating," and lacks a basic understanding of how to read a call detail record. In the same graphic [Exh. F], Agent Kunkle uses

8

the term "terminating cell site and sector for the call" to indicate the last cell tower a phone uses in the call. Agent Kunkle refers to this as the "Last Serving Cell Site" and "Last Serving Cell Face." This is completely incorrect and misleading to the uneducated fact finder. The word "terminating" is one of the most basic terms used in this particular scientific community and is specific to a phone connection, not the termination or ending cell tower site. As Mr. Levitan states, using the term "last" indicates a complete lack of industry knowledge.

Third, another graphic by Agent Kunkle misidentifies the directional transceivers. [Exh. G, Graphic 4]. Agent Kunkle incorrectly labeled these as "antenna" with the directional terms of "Alpha, Beta and Gamma." However, these terms are not even used by Verizon. These terms are instead associated with the AT&T and Sprint networks. Verizon utilizes the terms D1, D2 and D3 for towers with three directional transceivers. Once again, this error "shows a lack of industry experience that would affect the evaluation of records from Verizon" according to Mr. Levitan.

Fourth, Agent Kunkle also misidentifies and mislabels the Sprint records used in graphic 5 in the same manner the Verizon records were mislabeled in graphic 3. [*See* Exh. H, Graphic 5]. However, even more disconcerting is graphic 6 [Exh. I], which shows an incorrect orientation of Sprint towers. In this graphic, Agent Kunkle orients "Sector 1" pointing to the northeast, while "Sector 2" points south and "Sector 3" points to the northwest. First, these transceivers are mislabeled, as an expert familiar with the Sprint Network would know they correctly label their transceivers with "Alpha," "Beta" and "Gamma."

Even worse, those familiar with the Sprint Network would also know that "Sector 1" (properly known as "Alpha") **always points north,** *not northeast*. Hence, the exhibit is incorrectly labeled and oriented and Agent Kunkle's analysis is fatally flawed as he does not comprehend the

9

directionality of Sprint transceivers. Relying on this graphic, the Agent and/or the fact finder would determine that a signal was being retrieved from the northwest instead of the north. This error demonstrates why the conclusions reached are incorrect and why Agent Kunkle is not qualified as an expert. Any Sprint record previously interpreted with this orientation will place the phone in the wrong location and render the analysis incorrect.

Finally, terms are again mislabeled in graphic 7 [Exh. J], showing that Agent Kunkle does not have the appropriate knowledge, skill or training to conduct a scientifically accurate expert analysis.

### C.  Agent Kunkle's Errors in Methodology

A cell phone is a radio which radiates a 360-degree radio frequency signal. Cell phones are omni directional meaning their signals go north, south, east, west, up, and down. Cell towers also radiate a 360-degree radio frequency signal. Cell towers can be engineered to cover certain areas, for example the signal can be elongated to cover a stretch of highway, as opposed to covering a 360-degree radius in an urban area.

Each cell tower is intended to cover the largest area possible, in order to provide the greatest coverage at the lowest cost. Generally, this area is approximately 5 to 12 square miles around the cell tower. If a certain cell tower is identified as being used by a phone, a qualified expert can opine that phone is located within 12 miles.

Towers are placed and oriented by cell phone companies to provide the maximum coverage in a market. The goal of network RF engineers is to use a minimum number of cell towers to provide full coverage of a market. Factors in network RF design include population density, terrain, real estate costs, backhaul considerations and the technology being used. The resulting network

design assures that each geographic area of a market is covered by one cell tower with minimal overlap.  As such, when evaluating cell phone records it's most likely that any call that is "originated" or "terminated" from a cell tower is the closest cell tower with best signal.

Call Detail Records therefore identify the closest cell tower however the location of the phone within the cell tower's coverage area cannot be specifically determined from historical cell phone records.  The actual coverage area of a cell tower can be determined from the carriers "RF plan" which is a living document that depicts the coverage area of each cell tower.  The coverage area of a cell tower varies widely.  In an urban area, a cell tower may cover an area of approximately two miles in each direction.  Thus, an urban cell tower covers an area of approximately 12 square miles.  In more rural areas a cell tower may cover hundreds of square miles.

Even with an accurate RF plan no expert can opine as to the actual location of a phone within the coverage area.  If a cell tower covers one square mile, the expert can state that the phone is located within that one square mile.  This is the same size as about 484 football fields.  This analysis is the limit that can be performed by a reputable expert in the field. Said concisely, the technology does not permit a more accurate assessment except to say that the phone is in the vicinity of the closest cellular tower up to a distance of 12 miles depending on the number of towers in the area.

Given his analysis, this rudimentary understanding of cellular networks appears to be far beyond the expertise of Agent Kunkle.  First, the government's graphics erroneously show the coverage of each cell tower is approximately the same. As explained above, in order to properly determine the general location of a cellular phone, one must first determine where *all* of the cell towers in a particular area are located. Agent Kunkle goes to great lengths to include each crime scene within his flawed analysis, yet has failed to consider towers that are in closer proximity to the

crime scenes that **would specifically exclude** Mr. Daniel from being at a particular crime scene. As Mr. Levitan concludes: "if a phone is attached to a cell tower that is not closest to the crime scene, it can be said that the phone is excluded from the crime scene without exception."

In addition, Agent Kunkle's graphic 9 [Exh. K] purportedly shows every cell phone tower for the Verizon, Sprint, and AT&T networks in the greater Cleveland area. While the graphic is difficult to read, it appears that about 300 towers are plotted by Agent Kunkle.[1] Yet, Mr. Levitan states that AT&T alone has approximately 1309 cellular antennas in the Cleveland area. Agent Kunkle's map fails to depict all of the antenna in the area, a fatal flaw to Agent Kunkle's entire analysis. While the government shows in their inaccurate graphics the location of crime scenes and the cell tower purportedly used, it has not considered where *all* of the towers in a particular area are located. Unless the analysis is completed with an accurate tower map, an inaccurate and false conclusion will be reached. Agent Kunkle's analysis is fatally flawed in this regard and he and his inaccurate exhibits must be excluded.

Even putting this fatal flaw aside and forgetting for a moment that Agent Kunkle does not know how to properly orient Sprint cellular towers, the graphics produced are misleading. An accurate depiction would not assist the government to prove its theory as it would broaden the possible area where a phone may be located. For example, in graphic 11 [Exh. L], the government suggests the coverage is within 1/3 of a mile from a particular cell tower. Mr. Levitan opines that a cell tower with only a 1/3 of a mile range would be cost prohibitive and not installed by a network. Furthermore, the extension of the "arms" in this graphic is also inaccurate because there are several other towers in the area which would result in "double coverage." Mr. Levitan concludes that

---

[1] The undersigned and his staff counted these points several times, with none of the results exceeding 300.

because of these major problems the entire graphic is not valid scientifically to people who are actual experts in the field. It is self-serving for the government's purposes and must be excluded because these exhibits are no accurate or scientifically-based. Instead, they were impermissibly designed to buttress the government's case and thus should be excluded.

Also, Agent Kunkle does not incorporate the immense variation in coverage areas utilized by network engineers. As stated above, towers may be configured to extend straight down a roadway, for a high-volume area, or through narrow corridors between buildings. Cell towers are configured to traffic-patterns and population density. None of these factors are accounted for in the government's deceptive graphics.

The government seeks to elicit testimony that the technology is uniform and easy to understand. This is incorrect. A proper analysis is complicated because it contemplates multiple variables and factors. Here, it appears Agent Kunkle retrieved an inaccurate cell tower map, plotted towers without consideration of the type of signal radiated or where other towers may have been and thus conformed the graphics to the government's version of its case.

It is the government's prerogative to engage in this folly, but it is the Court's prerogative to exclude any expert and evidence that would mislead the jury. Mr. Levitan concludes his report with a sobering observance – the F.B.I. possesses the proper equipment to make a proper analysis but has chosen not to do so in this case. Thus, there should be no question that Agent Kunkle should be disqualified and his flawed report should be excluded in its entirety.

## II.  THE **DAUBERT** STANDARD AND EVIDENCE RULES 401, 402 and 403

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the United States Supreme Court fashioned a two-prong analysis for determining whether expert scientific evidence

or testimony is admissible under Federal Evidence Rule 702. Under the Daubert test, scientific evidence is only admissible if: (1) the evidence constitutes scientific knowledge; and (2) the evidence is relevant. Sigler v. American Honda Motor Co., 532 F.3d 469, 478 (6th Cir. 2008) (citing Daubert, 509 U.S. 589, 592-93). The threshold question becomes whether the cellular phone evidence is "scientific knowledge" under Daubert.

Daubert provides a list of factors to employ when assessing the reliability of scientific expert testimony, which includes: (1) whether the expert's scientific technique or theory can be, or has been, tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. United States v. Turner, 287 Fed.Appx. 426 (6th Cir. 2008) (citing United States v. Beverly, 369 F.3d 516, 528 (6th Cir. 2004)).

For the reasons stated above, Agent Kunkle is not an expert, he has employed flawed techniques, the potential of error is high, and his methods are not accepted in the scientific community. Therefore, he and his exhibits should be excluded from trial.

### A. Evidence is also inadmissible under Fed. R. Evid. 401 and 402

The evidence provided by Agent Kunkle is not reliable in any fashion as it was created in ignorance of the relevant field and is so inaccurate and misleading it does not tend to make any relevant fact "more or less probable." Fed. R. Evid. 401, 402. The evidence as presented would only serve to mislead the jury. The government has had ample time to retain a qualified expert and to produce a report grounded in scientifically accepted practices and procedures. It has chosen not to do so, and the report must be excluded.

### B. Evidence is inadmissible under Fed. R. Evid. 403

Should this Court find the evidence regarding the report somehow relevant, despite all evidence to the contrary, the evidence remains inadmissible under Fed. R. Evid. 403. Federal Evidence Rule 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Agent Kunkle's flawed analysis is inadmissible under this Rule because the risk of prejudice from the jury believing the flawed and inaccurate report greatly outweighs any probative value, which is minimal in this case given the erroneous methods employed by Agent Kunkle. For the reasons stated above, the evidence should be excluded.

## III. CONCLUSION

For the foregoing reasons and cited authority, Mr. Daniel asks this Court to grant his Motion in Limine, excluding the introduction of Agent Kunkle and his cellular phone "evidence" including

15

all related exhibits and testimony.  Agent Kunkle's flawed report is irrelevant and misleading to the issues at trial and must be excluded under Fed. R. Evid. 401 and 402.

Should this Court find the evidence to be admissible under  Fed. R. Evid. 401, 402, and 403, the evidence should be excluded under Fed. R. Evid. 702.  Mr. Daniel asks the Court to find that the cellular analysis performed by Agent Kunkle  in this case does not satisfy <u>Daubert</u> and thus does not satisfy Rule 702.

>     Respectfully submitted,
>
>     */s/ Carlos Warner*
>     CARLOS WARNER (0068736)
>     Assistant Federal Public Defender
>     Akron Centre Plaza
>     50 S. Main St., Ste. 700
>     Akron, OH 44308
>     Phone: (330) 375-5739; Fax: (330) 375-5738
>     E-Mail: carlos_warner@fd.org

**CERTIFICATE OF SERVICE**

On May 13, 2015, a copy of the foregoing Defendant Nicholas Daniel's Motion in Limine will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

*/s/ Carlos Warner*
CARLOS WARNER (0068736)
Assistant Federal Public Defender